UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

|  |  |
|---|---|
| M.J.,<br><br>    Plaintiff,<br><br>vs.<br><br>FRANK BISIGNANO, COMMISSIONER<br>OF SOCIAL SECURITY;<br><br>    Defendant. | 4:25-CV-04080-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

**INTRODUCTION**

Plaintiff M.J. seeks judicial review of the Commissioner's final decision denying her application for Social Security disability benefits under Title II and Title XVI of the Social Security Act.[1] Ms. J requests reversal of the

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference—greatly simplified—is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See, e.g., 20 C.F.R. §§ 404.1520 & 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). Ms. J. filed her application for both types of benefits. AR17.

1

Commissioner's final decision denying her disability benefits, and remand of the matter to the Social Security Administration for further proceedings.  See Docket No. 11.  The Commissioner seeks affirmance of the agency's decision below.  See Docket No. 12.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g).  The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS

### A.    Procedural History

Ms. J. applied for disability benefits under Title II and Title XVI of the Social Security Act, alleging a date of disability of April 27, 2022.  AR17. Ms. J.'s application was denied initially and again upon reconsideration.  Id.  A telephonic hearing was held before an ALJ, who found Ms. J. not disabled.  AR 27, 34.  Ms. J.'s request for review of the Appeals Council was denied.  AR 1-3.

The issue before the Court is whether the ALJ's residual functional capacity ("RFC") finding is deficient because it does not account for the total limiting effects of Plaintiff's migraine impairments.  Docket No. 11 at 1. Accordingly, the court discusses below only the medical records relevant to Ms. J's migraines.

**B.    Medical Evidence**

**1. Records Predating Alleged Onset of Disability**

**a. Colorado Records**

In a December 11, 2015, visit to the emergency room for right ankle pain, it was noted that Ms. J. was prescribed Topamax and acyclovir for migraines, but that she was not taking them.  AR 846.

On December 13, 2018, Ms. J attended an appointment at the University of Colorado Health Neurology Clinic (UCHealth).  AR 766.  Ms. J.'s provider diagnosed Ms. J. with migraines that were "not intractable" and "with aura and without status migrainosus."[2]  Id.  At this appointment Ms. J. told her provider that she has a history of complex migraines dating back to when she was 17 years old, primarily in the bilateral frontal region.  AR 767.  She reported that she was having headaches daily, and that before her migraines, she sees spots in her vision.  Id.  Ms. J. also experienced photophobia,[3] phonophobia,[4] nausea, and vomiting during the migraines.  Id.

---

[2] Status Migrainosus is defined as "a migraine attack that lasts longer than 72 hours." Status Migrainosus, https://my.clevelandclinic.org/health/diseases/status-migrainosus (last visited February 2, 2026).

[3] Photophobia is defined as "[e]xcessive sensitivity to, or intolerance of, light." *Photophobia*, ATTORNEYS' DICTIONARY OF MEDICINE (No. 59, 2025).

[4] Phonophobia is defined as "[a] condition of extreme intolerance or fear of sounds and noises." *Phonophobia*, ATTORNEYS' DICTIONARY OF MEDICINE (No. 59, 2025).

3

Ms. J's primary care physician prescribed rizatriptan and Topamax to treat her migraines.  Id.  Ms. J. told the provider that she had not yet started Topamax because she did not know how to use it.  Id.  The provider advised Ms. J. to discontinue rizatriptan because Ms. J.'s stroke contraindicated the use of triptans.  AR 767-768.  Ms. J was also prescribed Flexeril.[5]  AR 768.

On June 6, 2019, Ms. J. reported having over 15 headaches a month, and at least eight of those were migraine days.  AR 761.  The migraines lasted over four hours.  Id.  Ms. J had began using her Topamax following her appointment in December of 2018.  Id.  At this appointment, her provider noted that Ms. J. "has trialed and failed to oral preventative pharmacological agents listed as level a per American headache Society/American Academy of neurology (failure is defined as lack of efficacy, allergy, intolerable side effects or significant drug-drug interaction)."  Id.  Ms. J. found Topamax mildly effective but suffered from side effects.  Id.  In its place, a trial run of Emgality[6] was prescribed.  AR 761-762.  It appears Flexiril was discontinued.  AR 762. At a June 26, 2019, doctor visit, Ms. J. reported worsening headaches. AR 756.

On January 9, 2020, Ms. J. had been using Emgality for six months, and it had been working quite well for Ms. J. until 3 weeks prior to the visit.  AR

---

[5] Flexeril is "[t]he trademark name of medicinal tablets used for muscle spasm." *Flexeril*, ATTORNEYS' DICTIONARY OF MEDICINE (No. 59, 2025).

[6] Emgality is "[t]he trademark name of a drug intended for use in prevention of migraine and in treatment of episodic cluster headache."  *Emgality*, ATTORNEYS' DICTIONARY OF MEDICINE (No. 59, 2025).

751.  Ms. J. described having a significant rise in the number of migraines she experienced in the last three weeks.  Id.  Her provider discussed Botox injections and Aimovig[7] as possible substitute medications.  Id.  Ms. J. chose to try Botox. Id.  On February 6, 2020, Ms. J. had her first Botox injection to treat her migraines.  AR 749.

In an April 30, 2020, appointment, Ms. J. informed her provider that she had previously experienced migraines 30 times a month, but with Botox she had no migraines.  AR 747.  Ms. J. reported that the Botox had worn off some in the last two weeks before her next injection.  Id.  She had a second Botox shot.  AR 748.  Ms. J had her third Botox shot on September 3, 2020.  AR 743-44.  The provider noted Ms. J should repeat the injection in 3 months.  AR 744.

On September 4, 2020, Ms. J. attended an appointment regarding her migraines.  AR 739.  The medical plan was to continue Botox which her provider noted caused "a greater than 75% reduction in intensity, frequency and duration of migraines."  Id.  Ms. J. reported the Botox worked "extremely well" and reduced her migraines to only three in three months.  Id.  Ms. J. reported that when she did have migraines, they occurred one to three weeks prior to her next injection.  Id.

On February 11, 2021, Ms. J. received a Botox injection.  AR 731-32.

**b. South Dakota Records**

---

[7] Aimovig is "[t]he trademark name of a drug intended for use in prevention of migraine."  *Aimovig*, ATTORNEYS' DICTIONARY OF MEDICINE (No. 59, 2025).

On September 8, 2021, Ms. J. attended an appointment at Horizon Health Care in Yankton, South Dakota, reporting increased headaches. AR 1218. She told her providers she had moved to South Dakota in February of 2021 but was planning to take trips down to Colorado until she could establish Medicaid in South Dakota. Id. Ms. J. had last filled her prescribed Percocet in June and planned to have it filled again in Colorado. Id.

**2. Records After Alleged Disability Onset**

Ms. J. attended an appointment at Avera Medical Group Pain Management (Avera Pain Management) on April 29, 2022. AR 1498. At this appointment she expressed that her migraines had worsened since moving from Colorado, and that her worst pain level in the last week was an 8/10 and her average was 2/10. AR 1499. Ms. J. admitted that when her migraines were bad that she would take additional Percocet. Id.

On October 4, 2022, Ms. J. attended an appointment at Horizon Health care, with a complaint of daily migraines over the past two months. AR 1348. She stated that she was still going to Colorado to obtain her cardiac medication because she still had active Medicaid coverage there. Id. Ms. J. further explained that she used to follow up with Avera Pain Management for her migraines, but had to stop due to finances. Id.

At an Avera Pain Management appointment on December 7, 2022, Ms. J rated her migraine pain a 10/10. AR 1529. It is noted in her chart that Ms. J. had not visited her clinic in four months. AR 1526. She expressed that she

had not taken pain medication for several months and her provider did refill her prescription Percocet.  AR 1525; 1528.

At a January 10, 2023, appointment for medication refills, Ms. J. rated her migraine pain an 8/10.  AR 1537.  She stated she was without insurance but would be able to get Medicaid in the spring or summer.  AR 1534.  Ms. J. reported a 7/10 pain rating for her migraines at a February 9, 2023, visit for pain management.  AR 1540, 1544.

On July 11, 2023, Ms. J.'s chart noted that she was having near-daily migraines.  AR 1573.  She stated that more than 15 of the migraines last longer than four hours.  Id.  The chart noted that she has tried NSAID, Topamax, triptans, Emgality, and Botox to treat migraines.  Id.  Out of those treatments Ms. J. reported that Botox injections had positive results and that she wanted to begin them again.  Id.

On August 14, 2023, Ms. J. reported to her provider that she has had migraines since she was 15 years old.  AR 1580.  Ms. J. noted that she had Botox injections in the past which gave her excellent pain relief from her migraines.  Id.

At an October 12, 2023, appointment, when asked to identify the location of her pain and to rate her pain, Ms. J. indicated the back of her head and rated the pain for her migraine a 5/10.  AR 1596.  Although Ms. J's medical provider had authorized her to receive Botox injections for her migraines, these were denied by South Dakota Medicaid.  AR 1592.

On December 14, 2023, pain management medical appointment, Ms. J. again rated her migraine pain a 10/10.  AR 1610.

## C.    Ms. J.'s Hearing Before the ALJ

A telephonic hearing in front of an ALJ occurred on December 19, 2023. AR 34.  Present at the hearing was Ms. J., her attorney, Walter Hermann, Vocational Expert (VE) Sandra Smith-Cordingly, and court reporter Shareka Martin.  AR 36.  Ms. J. reported that she had moved back to South Dakota after living alone in Colorado so that she could stay with her children, as she could no longer afford to live on her own.  AR 39.  Ms. J testified that her final day of employment was January 31, 2018.  AR 47.

Ms. J. testified that she has three to four migraines each week.  AR 45. Her migraines can last up to three days.  Id.  Ms. J. described her migraines as "very intense."  Id.  Ms. J. also testified that her migraines cause nausea and blurred vision.  Id.  To combat the migraines, Ms. J. lays down in a dark space. Id.  When asked about treatments she had tried for migraines, she explained that she has tried "every drug possible."  AR 46.  Ms. J. said that she only found relief with Botox injections, but that her Medicaid insurance does not cover Botox injections.  Id.

VE Smith-Cordingly testified next.  AR56.  The ALJ presented the following hypothetical:

> This person can occasionally lift or carry 20 pounds; frequently lift or carry ten pounds; sit for six out of eight hours; stand or walk for four out of eight hours; no climbing ladders, ropes or scaffolds; occasionally climb stairs and ramps, stoop, crouch, kneel and crawl, and frequently handle or operate hand controls; can never perform commercial driving, or operate moving machinery;

8

can never work around hazards such as unprotected heights or uncovered, unguarded moving machinery; can understand, remember and carry out simple instructions; cannot work at a production rate pace such as assembly line work, and would be 10% off task throughout the workday for restroom breaks.

AR 57.  The ALJ asked the VE whether a person with those restrictions could perform Ms. J.'s past work.  Id.  The VE responded "[p]ast work would be ruled out."  Id.  The VE offered instead that Ms. J. could find work as a garment sorter, office helper, or folder.  Id.

The ALJ offered a second hypothetical: "Assume everything in the first hypothetical except for the following. This person will need a cane for walking; this person can tolerate moderate noise levels as defined by the DOT."  AR 58. The ALJ asked whether such a person could perform any other work that exists in significant numbers in the national economy.  Id.  The VE replied that the DOT does not address handheld assistive devices such as a cane.  Id.  The VE followed up that in her professional experience that if a cane is used, a person can only perform sedentary work.  Id.

The ALJ introduced a third hypothetical that would have the individual at 20% off task and will miss two days of work a month.  AR 58-59.  The VE explained that "off-task tolerances and absenteeism also are not addressed by the DOT."  AR 59.  The VE did provide that based on her professional experience that "either individually or certainly combined, they would be work preclusive."  Id.

**D. The ALJ's Decision**

On April 1, 2024, the ALJ denied Ms. J.'s application for benefits in a written decision.  AR14-27.  The ALJ found that Ms. J. suffered from the following severe impairments: "atrial fibrillation, hypertension, diabetes, neuropathy, arthritis of wrist, degenerative joint disease of the right knee, migraines, altered bowel function/colon cancer, hypersomnia, and obesity." AR20.  The ALJ held that these impairments "significantly limit the ability to perform basic work activities as required by SSR 85-28."[8]  Id.

The ALJ found that Ms. J. "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)."  AR21.  The ALJ supported this conclusion by examining Ms. J.'s abnormality of a major joint,[9]

---

[8] The ALJ found that the following impairments were non-severe and do not cause a lapse of employment longer than three months: "impaired hearing, finger dislocation, left wrist status post fall, hypokalemia, hyperuricemia, and paresthesia of skin."  AR 20.  Regarding Ms. J.'s anxiety, the ALJ found that it "does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere."  Id.

[9] The ALJ considered 1.18 and found that Ms. J does not meet the guidelines within the listing.  AR 21.

hypertension,[10] her atrial fibrillation,[11] diabetes mellitus,[12] neuropathy,[13] obesity,[14] and colon cancer.  AR 21-23.  The ALJ did not mention Ms. J's migraines in findings at step three, nor did he reference Listing 11.02 for epilepsy.  Id.

> At step four the ALJ formulated the following RFC:
>
> "[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can lift or carry 20 pounds occasionally and 10 pounds frequently.  The claimant can sit 6 hours out of 8 hours and stand or walk 4 out of 8 hours.  The claimant cannot climb ladders, ropes, or scaffolds.  The claimant can occasionally climb ramps and stairs, stoop, crouch, kneel, and crawl.  The claimant can frequently handle or operate hand controls.  The claimant can never perform commercial driving or operate moving machinery.  The claimant can never work around hazards such as unprotected heights or uncovered/unguarded moving machinery.  The claimant can understand, remember, and carry out simple instructions.  The claimant cannot work at a production rate pace such as assembly line work.  The claimant will be 10% off task throughout the workday for restroom breaks."

---

[10] The ALJ found that Ms. J.'s hypertension fails to meet or medically equal 4.02 or 4.04 of Appendix 1 impairments.  AR 22.

[11] Ms. J. failed to provide that her atrial fibrillation is not related to reversible cause.  Nor had she provided evidence that the condition was "uncontrolled and recurrent episodes of cardiac syncope or near syncope, despite being on prescribed treatment."  AR 22.

[12] The ALJ noted in the opinion that "condition has not caused listing level end organ damage such as amputation, retinopathy, coronary artery disease, peripheral vascular disease, gastroparesis, nephropathy, skin infections, neuropathies, or problems with cognition, depression, or anxiety."  See 9.00(B)(5).  AR 22.

[13] The ALJ found that Ms. J.'s neuropathy does not meet Listing 11.14.  AR 22.

[14] The ALJ notes that obesity is no longer a listed impairment, but it was considered in relation to the musculoskeletal, respiratory, and cardiovascular body systems listings as required by the Ruling.  AR 22.

AR 23.

The ALJ stated that Ms. J.'s migraines "cause pain, nausea, and blurred vision" and that she "has tried several treatments including Botox."  AR 24. The ALJ found that:

> [the] claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they were considered using the factors contained in SSR 16-3p, 20 CFR 404.1529(c), and/or 416.929(c)).  The claimant's allegations are inconsistent with the objective medical evidence and the claimant's activities of daily living.  Diagnostic imaging and testing do not support the severity of the claimant's allegations (C1F).  The claimant's physical examinations have been relatively unremarkable (C1F; C15F; C18F).  The claimant has received significant relief from use of a relatively static and conservative treatment regimen (C18F/2).

AR 25.  The ALJ also wrote:

> The claimant has taken medication to treat her impairment related symptoms.  The claimant stated at an April 2022 treatment visit that pain medication helped reduce her pain; she stated that she experienced relief from Percocet (C18F/2).  The claimant has taken Botox to treat her migraine headaches (C18F/9).  The claimant has also taken . . . Tramadol, and other medications to treat her impairments and impairment related symptoms.

AR 24.

The ALJ concluded that with the above RFC, that Ms. J. could not return to her past relevant work as a waitress.  AR 26.  The ALJ also stated that Ms. J. is an "individual closely approaching advanced age, on the alleged disability onset date," and that she has a limited education.  Id.

Taking those factors into account with the RFC, the ALJ concluded that there are jobs with "significant numbers in the national economy that the claimant can perform."  Id.  Specifically, the ALJ concluded that she could work as a "garment sorter (DOT #222.687-014; 53,000 positions in existence

nationally), office helper (DOT #239.567-010; 61,000 positions in existence
nationally), and folder (DOT #369.687-018; 43,000 positions in existence
nationally)."  AR 27.

The ALJ finished by stating that "considering the claimant's age,
education, work experience, and residual functional capacity, the claimant is
capable of making a successful adjustment to other work that exists in
significant numbers in the national economy."  Id.  Therefore, the ALJ found
that Ms. J. was not disabled.  Id.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the
Commissioner's final decision if it is supported by "substantial evidence [i]n the
record as a whole."  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th
Cir. 2009) (citing Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997)).
"[S]ubstantial evidence [is] defined as 'more than a mere scintilla.  It means
such relevant evidence as a reasonable mind might accept as adequate to
support [the Commissioner's] conclusion.' "  Klug v. Weinberger, 514 F.2d 423,
425 (8th Cir. 1975) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).
"This review is more than a search of the record for evidence supporting the
[Commissioner's] findings, and requires a scrutinizing analysis, not merely a
rubber stamp of the [Commissioner's] action."  Scott ex rel. Scott v. Astrue, 529
F.3d 818, 821 (8th Cir. 2008) (internal quotations and citations omitted).  Yet,
"[i]n conducting [its] limited and deferential review of the final agency

13

determination under the substantial-evidence standard, [the court] must view the record in the light most favorable to that determination.  Chismarich v. Berryhill, 888 F.3d 978, 980 (8th Cir. 2018).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it.  Minor, 574 F.3d at 627.  The Commissioner's decision may not be reversed "merely because substantial evidence would have supported an opposite decision."  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).  "[I]f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings," the Commissioner must be affirmed.  Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993) (quoting Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record."  Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis.  Erroneous interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted).  The Commissioner's conclusions of law are only

persuasive, not binding, on the reviewing court.  Smith, 982 F.2d at 311

(finding "appropriate deference" should be given to the SSA's interpretation of

the Social Security Act).

**B.    The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any

substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve

months.  42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505.[15]  The

impairment must be severe, making the claimant unable to do his previous

work, or any other substantial gainful activity which exists in the national

economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is

disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB

applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R.

§ 404.1520.  The five steps are as follows:

> **Step One**: Determine whether the applicant is presently engaged
> in substantial gainful activity.  20 C.F.R. § 404.1520(b).  If the
> applicant is engaged in substantial gainful activity, she is not
> disabled and the inquiry ends at this step.
>
> **Step Two**: Determine whether the applicant has an impairment or
> combination of impairments that are *severe*, i.e., whether any of
> the applicant's impairments or combination of impairments

---

[15] Although Ms. J. has applied for both Title II and Title XVI benefits, for the
sake of simplicity, the court herein cites to only the regulations applicable to
Title II where the corresponding Title XVI regulation is identical.  It is
understood that both Titles are applicable to Ms. J.'s application.  Any
divergence between the regulations for either Title will be noted.

significantly limit her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments, the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment*, the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe*) to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e)-(f); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five. 20 C.F.R. §§ 404.1520(f).

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 404.1520(g).

## C.    **Burden of Proof**

The plaintiff bears the burden of proof at steps one through four of the

five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994);

Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at step five.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994).  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices."  Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting is "a long-standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 n.3 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."  Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

**D.    Assignment of Error**

Ms. J. appeals only one issue—whether the "ALJ's RFC finding is contrary to law as it does not account for the total limiting effects of Plaintiff's impairments, particularly off-task limitations related to her migraine headaches."  Docket No. 11, at 1.  The law concerning an ALJ's formulation of a claimant's RFC follows.

### 1. RFC Formulation—The Standard

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered). "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability. 20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013). The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are nonsevere. Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996). Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[16] Lauer, 245 F.3d at 703 (citations

---

[16] Relevant evidence includes: medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations. See SSR 96-8p.

omitted) (emphasis added).  Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." <u>Id.</u> (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p.  If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." <u>Id.</u>  Medical opinions are evaluated based on whether they are supported and consistent with other evidence in the record. 20 C.F.R. § 404.1520c.  Other factors considered in determining what weight to give a medical opinion are whether the medical provider had a relationship with the claimant and whether the provider has a specialization that makes them more qualified to render an opinion within a particular area.  <u>Id.</u>

RFC is an ultimate issue reserved to the ALJ.  <u>Id.</u> at n.8.  Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations.  <u>Id.</u>  However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source.  <u>Id.</u>

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p.  However, the ALJ "must make every

reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . .  In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

Finally, "to find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

### 2. Whether the ALJ Properly Discounted Ms. J.'s Complaints of Migraine Pain and Impairment

#### a. The Law Pertaining to Discounting Claimant's Testimony

Clearly at odds are Ms. J.'s description of her migraine pain/impairment and the ALJ's formulation of Ms. J.'s RFC.  Ms. J. stated she has up to four migraines a week and that any one migraine may last for up to three days.  AR 45-46.  Ms. J. testified these migraines are accompanied by nausea, blurred vision, and that she must lie down in a dark room when she is experiencing a migraine.  Id.  Yet the only off-task allowance in the ALJ's RFC is 10 percent for

20

bathroom breaks, no off-task time is allowed for migraines.  AR 23.  The first question, then, that the court must address is whether the ALJ properly discounted Ms. J.'s description of the pain and impairment she suffers from migraines.

The Eighth Circuit has held that the ALJ must consider the following factors in deciding whether to discredit a claimant's subjective complaints of pain and impairment:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

An ALJ may not discount a claimant's subjective complaints solely because there are no objective medical findings—because there are not objective medical evidence in support of every type of impairment.  Id. "Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole."  Id.

The Agency's own internal guidance for evaluation of subjective complaints of pain is similar.  See SSR 16-3p.  Under that guidance, ALJs just consider the (1) intensity, persistence, and functionally limiting effects of symptoms; (2) objective medical evidence; (3) other evidence; and (4) the factors set forth in 20 C.F.R. ¶¶ 404.1529(c)(3) and 416.929(c)(3).  Id.

### b.     What the ALJ Stated He Relied On to Discount

Here, the ALJ discussed Ms. J.'s RFC at pages 23-25 of the AR.  Little is written about her migraines.  The ALJ wrote "The claimant testified that she

21

experiences several migraine headaches on a weekly basis; these migraines cause pain, nausea, and blurred vision.  The claimant has tried several treatments including Botox."  AR 24.  Again, as to migraines, the ALJ wrote, "The claimant has taken Botox to treat her migraine headaches (C18F/9)."  Id.

He then wrote in a general way about all her impairments:  "The claimant has taken medication to treat her impairment related symptoms.  The claimant stated at an April 2022 treatment visit that pain medication helped reduce her pain; she stated that she experienced relief from Percocet (C18F/2). . . . The claimant has also taken Carvedilol, ondansetron, Tramadol, and other medications to treat her impairments and impairment related symptoms."  Id.  Finally, the ALJ wrote that Ms. J. had started walking more and eating healthier.  Id. (citing C18F/9).

Other than the above, the ALJ noted in a very general sense, without specifying Ms. J.'s migraine impairment, that

> claimant's allegations [about the intensity, persistence, and limiting effects of all her impairments] are inconsistent with the objective medical evidence and the claimant's activities of daily living.  Diagnostic imaging and testing do not support the severity of the claimant's allegations (C1F) . . . The claimant has received significant relief from use of a relatively static and conservative treatment regime.  (C18F/2).  Finally, while the claimant's impairments have reduced their participation in recreational and social activities, the claimant still engages in social and physical activities.  (C18F/9; Testimony).

AR 25.

The administrative record contains longitudinal medical evidence concerning Ms. J.'s migraines that dates back to 2015 and continues up to the month of the ALJ hearing.  Despite this breadth of evidence, the ALJ cited to

only three exhibits in the record:  C1F, C18F/2, and C18F/9.  AR 24-25.  He
also cited without specificity to "testimony."  Id.

Exhibit C1F are Ms. J's medical records from Penrose Hospital in
Colorado Springs and from Centura Orthopedics, PSA, both in Colorado.
AR 376-682.  The records date from April 19, 2011, to January 30, 2020.
AR 376-682.  The ALJ did not cite to any particular page number within this
several-hundred-page exhibit.  The court finds none of these records are
relevant to Ms. J.'s migraine condition.  None of the records cover the period of
her alleged disability (April 27, 2022, to present) and none of the records
involve treatment for Ms. J.'s migraines.  See AR 376-682.  Citation to this
exhibit by the ALJ does not justify his discounting of Ms. J.'s subjective
complaints concerning her migraines.

The next exhibit cited by the ALJ is C18F at pages 2 and 9.  AR 24-25.
This corresponds to AR 1499 (C18F/2) and AR 1506 (C18F/9).  Page 2 of
Exhibit C18F is page two of a six-page medical record from a pain
management/medication refill visit at Avera Medical Group Pain Management
dated April 29, 2022.  AR 1498-99.  The page cited by the ALJ states in
relevant part that Ms. J. reported she suffers from migraines which have been
worse since she moved from Colorado a year prior.  AR 1499.  Ms. J. told her
medical care provider she had received regular Botox injections in Colorado for
her migraines.  Id.  This record also establishes that Ms. J. was suffering from
chronic low back pain, right elbow pain, and right hand pain.  Id.  The record
states "she has been using Percocet with good relief.  Unfortunately, she admits

she did take a few extra Percocet when her migraines are bad." Id.  Ms. J. stated she had "started walking more and eating healthier.  She has lost 20 pounds."  Id.  She rated her worst pain level in the last week at 8/10 and her average pain at 2/10, although the record demonstrates Ms. J. was complaining of pain from her low back, right elbow, and right hand as well as migraines, so it is unclear which source of pain was rated by these numbers or alleviated by Percocet.  Id.

The other page cited by the ALJ, page 9 of exhibit C18F corresponds to AR 1506, which is page 3 of an eight-page medical record for a medical visit to Avera Medical Group Pain Management dated June 7, 2022.  AR 1504, 1506. The purpose of the visit was medication/pain management and to give Ms. J. a trigger point injection into her occipital area for migraines.  AR 1505-06. Eighty milligrams of depomedrol and 4 milliliters of 25% bupivacaine were injected bilaterally into her occipital areas.  AR 1505.

The actual page cited by the ALJ indicated Ms. J. continued to experience migraines.  AR 1506.  She rated her worst pain level in the last week at 8/10 and her average pain at 2/10, although again the record demonstrates Ms. J. complained of pain not only from her migraines, but also from her low back, right elbow, and right hand.  Id.  The record again reflects that Ms. J. told her provider she had been "using Percocet with good relief."  Id. The record reflected that Ms. J. had now lost 50 pounds due to walking and eating healthier.  Id.

Finally, the ALJ cited to "testimony" in support of his decision to discount Ms. J.'s subjective complaints relative to her migraines.  AR 24.  The ALJ did not specify any particular page or passage from the hearing transcript. Id.  Ms. J.'s testimony at the hearing was that she was experiencing three to four migraines weekly, some of which last for a "couple of days."  AR 45-46. She testified her migraines are accompanied by nausea and blurred vision and that she has to lay down in a dark room when she has a migraine.  Id.  She testified that she has tried every medication for her migraines and that only Botox works.  AR 46.

### c.    The ALJ Did Not Articulate Sufficient Evidence to Discount Ms. J.'s Subjective Migraine Complaints

To reiterate, the ALJ must consider the evidence in the record as a whole when evaluating a claimant's subjective pain/impairment complaints including the claimant's daily activities; the duration, frequency, and intensity of the pain; precipitating and aggravating factors; the effectiveness of medication; and functional restrictions.  Polaski, 739 F.2d at 1322; SSR 16-3p.

Here, the records cited by the ALJ do not establish that Ms. J. was not having migraines or that they were adequately treated by medications she was able to obtain.  In the two records cited by the ALJ from the relevant time period, Ms. J. was complaining of multiple sources of pain and taking Percocet. Her statement that the Percocet was working well is ambiguous:  one cannot clearly connect that statement with her migraine pain as opposed to her low back, right elbow, and right hand pain.  Furthermore, those records show that she kept having migraines, despite the Percocet.  The occipital trigger point

injection also did not appear to address her migraine pain as she never
repeated the procedure and kept having migraines after the procedure.

The remaining medical records also do not support the ALJ's discounting
of Ms. J.'s migraine pain. In eight medical visits, she reported daily or near-
daily migraines from October 4, 2022, through December 14, 2023. AR 1348,
1529, 1537, 1540, 1544, 1573, 1580, 1592, and 1610. On July 11, 2023, she
reported having had 15 headaches in the last month that lasted for four or
more hours. AR 1573. She consistently rated her migraine pain at 5 out of 10
up to 10 out of 10. AR 1529, 1537, 1540, 1544, 1592, and 1610.

Nor do Ms. J.'s activities of daily living undermine her complaints. She
was not asked about her activities of daily living at the hearing before the ALJ.
The only thing in the record about activities are the two entries cited by the
ALJ from April 29 and June 7, 2022, in which Ms. J. reported she was walking
more and eating healthier and had lost 50 pounds. But this information must
be measured against other evidence in the record. Ms. J. was five feet, five
inches tall and weighed 220 pounds in July of 2022. AR 305. By the time of
the hearing before the ALJ she weighed 343 pounds. AR 49. Clearly, her
physical activities were not so pervasive to result in significant weight loss—
just the opposite, she gained weight. And a 50-pound loss of weight for one
experiencing such obesity is not significant.

Clearly, the ALJ discounted Ms. J.'s complaints of migraine pain as he
made no allowance for her to be off task for her migraines. His explanation for

why he discounted her subjective complaints is insufficient under <u>Polaski</u> and SSR 16-3p.  Remand is required for the ALJ to explain his decision further.

### 3.    Special Guidance on Primary Headache Disorder

The Social Security Agency has issued guidance to ALJs as to how to evaluate migraine headaches.  <u>See</u> SSR 19-4p (Aug. 26, 2019).  Because there is no Listing for migraines/primary headaches, SSR 19-4p directs that ALJs should consider the Listing for epilepsy, Listing 11.02.  <u>Id.</u> at *7.  Because the ALJ omitted any evaluation of Ms. J.'s migraines at step three of the sequential disability analysis, the court directs the ALJ on remand to evaluate Ms. J.'s migraines at step three by evaluating Listing 11.02 in accordance with SSR 19-4p.

Concerning the ALJ's reevaluation of Ms. J.'s migraines at step four on remand, SSR 19-4p states that in determining the claimant's RFC, the ALJ should consider the extent to which the person's reported impairments are consistent with the record evidence.  <u>Id.</u> at *8.  The guidance specifically states that if a person has photophobia as a part of their migraine symptoms—as Ms. J.'s medical records document she has—this may cause a person to have difficulty sustaining attention and concentration.  <u>Id.</u>  "Consistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC."  <u>Id.</u>  Here, the ALJ should take into consideration Ms. J.'s consistent pursuit of medical assistance for her migraines and the fact that her medical records consistently demonstrate that no medications she was

27

prescribed or with which she was injected alleviated the number of migraines and their symptoms except Botox.

### 4.    Affordability of Botox

The ALJ noted that Ms. J. took Botox for her migraines.  AR 24-25. However, he neglected to take note of the fact that, since Ms. J. moved to South Dakota, her Medicaid insurance would not pay for Botox treatment.  Her South Dakota medical providers authorized Botox injections for Ms. J. to treat her migraines, but South Dakota Medicaid denied coverage for Botox injections. AR 1592.

A claimant's subjective complaints of pain cannot be discounted because she does not take medication which is effective for treating her impairment where the record shows the reason she does not take this medication is because she cannot afford it.  See Tang v. Apfel, 205 F.3d 1084, 1086 (8th Cir. 2000); Alverio v. Chater, 902 F. Supp. 909, 927 (N.D. Iowa 1995).  In Ms. J.'s case, when her Colorado Medicaid would pay for Botox, she regularly sought and received this medical intervention.  See AR 731-32, 739, 743-44, 747-48, and 749.  After moving to South Dakota, she regularly sought treatment for her migraines, but none of the treatments she was able to afford (i.e. that Medicaid would cover) had the same efficacy as Botox.

The Commissioner argues that Ms. J. has not put forward sufficient evidence that she could not afford Botox.  The court finds the record establishes that fact.  The record establishes that Ms. J. has not worked since 2018, so she has no source of income.  She moved from Colorado to South

28

Dakota to live with her children because she could no longer afford to support herself.  When Botox was paid for by Medicaid in Colorado, Ms. J. regularly submitted to that treatment.  When she came to South Dakota, she requested Botox, her medical care provider authorized Botox for Ms. J., but Medicaid refused to pay for it.  Ms. J. continued seeking alternative treatments, but the medical records show that none reduced or eliminated her migraines and their attendant pain.  On remand, the ALJ is directed to consider the fact that Ms. J. could not afford Botox injections in determining whether Ms. J. is disabled.

### E.    Type of Remand

Section 1383(c)(3) of Title 42 of the United States Code provides that final decisions made by the Commissioner of the Social Security Administration as to Title XVI benefits shall be subject to judicial review under 42 U.S.C. § 405(g).  "Section 405(g) of Title 42, United States Code, authorizes judicial review of 'any final decision of the Commissioner . . . made after a hearing.' " Efinchuk v. Astrue, 480 F.3d 846, 848 (8th Cir. 2007) (quoting Mason v. Barnhart, 406 F.3d 962, 964 (8th Cir. 2005)).  It "authorizes only two types of remand orders: (1) those made pursuant to sentence four, and (2) those made pursuant to sentence six." Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000) (citing Melkonyan v. Sullivan, 501 U.S. 89, 98-99 (1991)).  A sentence four remand "authorizes a court to enter 'a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.' " Id. (quoting 42 U.S.C. § 405(g)).

"A sentence for remand is therefore proper whenever the district court makes a substantive ruling regarding the correctness of a decision of the Commissioner and remands the case in accordance with such a ruling." Id.  A sentence six remand is authorized "in only two limited situations: (1) where the Commissioner requests a remand before answering the complaint . . . or (2) where the new and material evidence is adduced that was for good cause not presented during the administrative proceedings." Id.  Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record 'overwhelmingly supports' such a finding." Id. at 1011 (quoting Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992)).  "[W]hen a claimant appeals from the Commissioner's denial of benefits and we find that such a denial was improper, we, out of 'our abundant deference to the ALJ,' remand the case for further administrative proceedings." Id. (quoting Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998)).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be supplemented, clarified, and/or properly evaluated under the applicable law.  See also Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) ("[A]n award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability.").  Therefore, a remand for further administrative proceedings so the ALJ can address these issues is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby:

ORDERED that the decision of the agency is reversed and this case is remanded for further proceedings pursuant to 42 U.S.C. ¶ 405(g).  Specifically, the ALJ is directed to consider Ms. J.'s migraines at step three by evaluating that impairment under Listing 11.02; the ALJ is directed to reevaluate and further explain what evidence it relies on to discredit Ms. J.'s subjective complaints of pain and impairment related to her migraines; and the ALJ is directed to apply SSR 19-4p and to address the affordability of Botox for Ms. J.

DATED this 11th day of February, 2026.

BY THE COURT:

_Veronica L. Duffy_

VERONICA L. DUFFY
United States Magistrate Judge